**SIGNED this 11 day of July, 2008.**

_____
**Marcia Phillips Parsons**
**UNITED STATES BANKRUPTCY JUDGE**

_____

**[This opinion is not intended for publication as the precedential effect is deemed limited.]**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| In re<br><br>TIMOTHY JARROD KIMBROUGH<br><br>Debtor. | No. 07-51022<br>Chapter 7 |
| FARM CREDIT SERVICES OF<br>MID-AMERICA, PCA,<br><br>Plaintiff,<br><br>vs.<br><br>TIMOTHY JARROD KIMBROUGH,<br><br>Defendant. | Adv. Pro. No. 07-5084 |

**M E M O R A N D U M**

Appearances:

Robert W. Quillen, II, Esq.  Clinton R. Anderson, Esq.
Kennerly, Montgomery & Finley, P.C.  Anderson & Anderson
Post Office Box 442  508 West Second North Street
Knoxville, Tennessee 37901-0442  Morristown, TN 37814
*Attorney for Farm Credit Services*  *Attorney for Timothy Kimbrough*
  *of Mid-America, PCA*

**Marcia Phillips Parsons, United States Bankruptcy Judge**. In this adversary proceeding, the plaintiff seeks a determination of nondischargeability under 11 U.S.C. § 523(a)(6) based on the defendant's alleged unauthorized sale of plaintiff's collateral and defendant's failure to pay the sale proceeds to the defendant, in violation of the terms of the parties' loan agreements. Presently before the court is the plaintiff's motion for summary judgment. Because the court concludes that genuine issues of material fact exist as to whether the injury to plaintiff was willful and malicious, summary judgment will be denied. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2)(I).

I.

The debtor Timothy Kimbrough ("Debtor") filed for bankruptcy relief under chapter 7 on July 28, 2007. A few months later on October 12, 2007, Farm Credit Services of Mid-America, PCA ("Farm Credit")[1] commenced the present adversary proceeding against the Debtor. Farm Credit's motion for summary judgment, filed June 13, 2008, is supported by the Debtor's responses to Farm Credit's interrogatories[2] and request for admissions, excerpts from two depositions of the Debtor, and the affidavit of Ronnie Sartain, a financial services officer for Farm Credit, to which is attached the promissory notes/loan agreements executed by the Debtor. The summary judgment motion is accompanied by a Statement of Undisputed Material Facts and a memorandum of law. The Debtor's response filed on June 25, 2008, which includes his own affidavit, disputes certain of the facts contained in Farm Credit's statement.[3] Farm Credit's reply to the Debtor's response, filed on June 30, 2008, contends that there is no genuine issue as to any material fact.

The following undisputed facts are gleaned from Farm Credit's statement and the Debtor's response. In 1997 and 1998, the Debtor executed a series of five promissory notes/loan agreements with Farm Credit totaling $100,740.00: (1) Promissory Note/Loan Agreement dated April 24, 1997, in the principal amount of $7,055.00; (2) Promissory Note/Loan Agreement dated May 12, 1997,

---

[1] Farm Credit is the successor to Farm Credit Services of Mid-America, ACA.

[2] In his response to Farm Credit's interrogatories, the Debtor provided a spreadsheet listing his cattle sales from April 24, 1997, to September 26, 2000.

[3] No memorandum of law was included in or otherwise accompanied by the Debtor's response as required by E.D. Tenn. LBR 7007-1(a) ("Any response [to a motion filed in an adversary proceeding] must be supported by a brief setting forth the facts and the law in opposition to the motion.").

2

in the principal amount of $3,065.00; (3) Promissory Note/Loan Agreement dated July 15, 1997, in the principal amount of $12,385.75; (4) Promissory Note/Loan Agreement dated September 19, 1997, in the principal amount of $48,752.50; and (5) Promissory Note/Loan Agreement dated April 10, 1998, in the principal amount of $29,481.75 (collectively, the "Notes").

The Notes are virtually identical with each other: all are three pages in length, with the first page setting forth in a large type the more common attributes of a promissory note: date, amount, interest rate, collateral, payment terms, and signature of the debtor. As set forth on the first page, the type of loan is listed as a "Revolving Line of Credit," interest is to be paid annually, and the loan is payable in its entirety on the maturity date, which is May 1, 2000. The security for each note is "All livestock and poultry." The next two pages set forth in smaller print the "Additional Provisions" of the promissory notes/loan agreements with Paragraph (2) on the final page stating as follows:

> (b) The Borrowers shall . . . immediately inform the Lender in writing of any change in Borrowers' address or the location of the Collateral. . . .
> . . . .
> (f) The Borrowers shall not dispose of any of the Collateral without the authorization of the Lender and, except as otherwise agreed to in writing by the Lender, shall apply the proceeds of all dispositions of the Collateral to payment of this loan.

On numerous occasions from 1998 through May 1, 2000, the Debtor moved cattle that was collateral for the Notes from Hamblen County, Tennessee to Texas and to Kansas without notifying Farm Credit in writing. During this same time period, the Debtor also sold cattle without the written permission of Farm Credit. Specifically, in 1999 the Debtor sold at least 962 head of cattle in seven sales with proceeds totaling over $738,000, and in 2000, the Debtor sold at least 868 head of cattle for a total of $370,000. Only $5,207.06 of sale proceeds from 1999 and 2000 were paid to Farm Credit. The Debtor used the proceeds from the vast majority of his sales of cattle for purposes other than the payment of the Notes, primarily to buy more cattle. In 1999 and 2000, the Debtor had purchases of cattle totaling $965,938.24 and $671,580.14 respectively. Farm Credit never agreed in writing that the Debtor could apply the sale proceeds to anything other than payment of the Notes. The Debtor suffered losses of $42,000 in 1998, $143,000 in 1999, and $422,000 in 2000.

When the Debtor failed to pay the Notes in full upon their May 1, 2000 maturity, Farm Credit sought and obtained on March 20, 2001, a judgment against the Debtor in state court in the amount of $108,623.82, comprised of principal of $85,935.39, interest of $16,442.70, and attorneys

3

fees and collection costs of $6,245.73.

Farm Credit alleges that the Debtor's unauthorized disposition of its collateral and his subsequent inappropriate use of the sale proceeds, in violation of the terms of the Notes, constitute the intentional tort of conversion and a willful and malicious injury under § 523(a)(6) of the Bankruptcy Code. Accordingly, Farm Credit maintains that it is entitled to summary judgment as a matter of law on its claim of nondischargeability. Moreover, Farm Credit contends that the entire debt owed it is nondischargeable, not just the value of its collateral converted by the Debtor.

The Debtor's affidavit and discovery responses supply some additional details concerning the transactions, some of which contradict Farm Credit's version of the events. The Debtor states that in 1997, while a 19 year-old college student, he decided to see if make some money preconditioning, backgrounding and selling cattle. According to the Debtor, "preconditioning" cattle means "confining purchased cattle, and starting them on antibiotics, immunizations, getting them to eat at a feed 'bunk,' de-horning them, castrating them, and adding i.d. usually an ear tag," and that "backgrounding" cattle is "turning them out to pasture, and supplementing their feed for growth." Other than a student loan, the Debtor had never borrowed money "and didn't know about liens, or security interests except that they gave the lender a right to repossess if the loan was not paid."

In April 1997, the Debtor went to the Farm Credit office and explained that he wanted a loan to buy, feed, and sell cattle. He was immediately approved for a $7,000 loan, payable in three years, and received drafts with which to buy cattle. In May 1997, he purchased calves at auction, but had to borrow another $3,000 from Farm Credit to complete the purchase because he miscalculated the purchase price. The Debtor sold the calves a couple of months later and repaid Farm Credit the amounts borrowed.

In July 1997, the Debtor returned to Farm Credit and requested additional credit to add to his previous lines of credit to buy a "load lot" of 50,000 pounds. With the new loan of $12,385.75, the Debtor purchased and turned out heifers on his grandfather's farm. In September 1997, the Debtor returned to Farm Credit and spoke with Ronnie Sartain. The Debtor advised that he wanted to borrow money to start retained ownership feeding, whereby he would purchase cattle, ship them to feed lots in the Midwest or West where they would then be fed and sold as "fat cattle" to

4

slaughterhouses. According to the Debtor, Mr. Sartain responded initially that he needed to talk with Farm Credit's attorney to check on its out-of-state lien rights, but subsequently called and advised that the additional loan would be approved. On September 19, 1997, the Debtor signed a new note with Farm Credit for $48,752.50. With this money, the Debtor purchased additional five weight (500 to 599 pounds) heifers and then kept them on his grandfather's farm until he had a load lot of 50,000 pounds. Each load lot would then be sent to Cattletown in Hereford, Texas. Upon a sale of cattle, the proceeds would go first to pay Cattletown because it had a feed lien, with the balance to the Debtor, which he applied to the line of credit.

In April 1998, anticipating that he would be soon out of school for the summer, the Debtor returned to Farm Credit and advised Ronnie Sartain that he wanted to bump up his credit to $100,000 so that he could keep loads going out all the time. Farm Credit had the Debtor sign the fifth promissory note in the amount of $29,481.75, raising the Debtor's line of credit to $100,000 as he had requested. The Debtor states that he began buying and selling very quickly, and could not keep up with whether he was making a profit. He used sale proceeds to buy more cattle rather than paying Farm Credit with the proceeds. When asked in his May 20, 2008 deposition why he didn't pay the proceeds to Farm Credit, the Debtor stated, "As far as keeping everything rolling, I was needing everything, plus. I was pushed to the max as far as money coming in, money going out. I'm sure the thought crossed my mind somewhere at that time I need to start paying down, but at this time I was moving the volume of cattle." The Debtor noted that he believed "that if [he] had used the proceeds to apply to the notes, [he] would have been given additional credit to purchase other cattle," and stated that it had never crossed his mind that he was hurting Farm Credit by his failure to turnover the sale proceeds, explaining that "I did not realize that Farm Credit would not want me to use the proceeds to purchase more cattle, without asking Farm Credit each time." "I was relying on the statement on the notes as to maturity dates, so long as I paid interest."

The Debtor states that he made money for a while, but lost money in 1999 and 2000. He paid the required annual interest payments to Farm Credit until 2000 at which point Farm Credit stopped the line of credit. The Debtor observes that he cooperated when Farm Credit called the notes due, hauling his cattle on hand, about 30-40 head, over to Knoxville Livestock Center at Farm Credit's request. Farm Credit also obtained the sale proceeds from two load-lots at feed lots. When Farm Credit obtained a judgment, the Debtor gave Farm Credit a plow and a head-gate facility

5

"which holds cattle when giving injections." The Debtor also made some installment payments on the judgment, and Farm Credit garnished 25% of his wages for three years.

The Debtor states that he never sold cattle other than in day-to-day operations. He also states that with the exception of paying himself an average of $150 per week for his work, he did not use the sale proceeds for anything other than for the cattle operations and to purchase new cattle. Reflecting on his losses in hindsight, the Debtor recognizes that he "got too big too quick," that he was young, inexperienced, and that he was not devoting himself full-time to his business operations since he was a full-time college student "with 18 hours of classes." " I didn't realize it at the time . . . I just had too much on me for that level of business."  "I did not intend to lose money, nor to make myself unable to repay Farm Credit.  I wanted to earn money.  I thought that by keeping the loan money invested, and purchasing more cattle after each sale, I would make money."

II.

Rule 56 of the Federal Rules of Civil Procedure, as incorporated by Federal Rule of Bankruptcy Procedure 7056, mandates the entry of summary judgment if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).  The court is not to "'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Browning v. Levy*, 283 F.3d 761, 769 (6th Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986)).

The moving party bears the initial burden of showing that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548 (1986).  The burden then shifts to the nonmoving party to produce evidence that would support a finding in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250-52.  In considering the motion, the court must construe all reasonable inferences in favor of the nonmoving party. *Spradlin v. Jarvis (In re Tri-City Turf Club, Inc.)*, 323 F.3d 439, 442 (6th Cir. 2003).  The party opposing a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial.  The party opposing the motion must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id*. at

6

442-43 (citations omitted). "If after reviewing the record as a whole a rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998).

### III.

The dischargeability of debts is governed by 11 U.S.C. § 523, which provides, in material part:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>     . . .
>     (6) for willful and malicious injury by the debtor to another entity or to the property of another entity[.]

11 U.S.C. § 523(a)(6). The party seeking a determination of nondischargeability bears the burden of proving the necessary elements by a preponderance of the evidence, *Grogan v. Garner*, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991), and § 523(a) is strictly construed against the plaintiff but liberally in favor of the debtor. *Rembert v. AT & T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998).

The Supreme Court has explained that "the word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional act that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61, 118 S. Ct. 974, 977 (1998). "[T]he (a)(6) formulation triggers in the lawyer's mind the category of 'intentional torts,' as distinguished from negligent or reckless torts" because "[i]ntentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'" *Id*. at 61-62. The Court observed, however, that "not every tort judgment for conversion is exempt from discharge. Negligent or reckless acts . . . do not suffice to establish that a resulting injury is 'wilful and malicious.'" *Id*. at 64. As restated by the Sixth Circuit Court of Appeals, "unless the actor desires to cause the consequences of his act or believes that the consequences are substantially certain to result from it, . . . he has not committed a 'willful and malicious injury' as defined under § 523(a)(6)." *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455, 464 (6th Cir. 1999). "To find that a debtor intended to cause the consequences of his act or believed that the consequences were substantially certain to result from his act, it is necessary to look into the debtor's mind,

7

subjectively." *Monsanto Co. v. Wood (In re Wood)*, 309 B.R. 745, 753 (Bankr. W.D. Tenn. 2004).

The second component of § 523(a)(6), that the injury is malicious, "means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent to do harm." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986). Stated another way, "There must . . . be a consciousness of wrongdoing. It is this knowledge of wrongdoing, not the wrongfulness of the debtor's actions, that is the key to malicious under §523(a)(6)." *ABF v. Russell (In re Russell)*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001) (citations omitted).

Applying this law to the record before the court in this present case, the court concludes that genuine issues of material fact exist that preclude summary judgment in Farm Credit's favor. Undeniably, Farm Credit's property rights were injured by the Debtor. The Debtor sold Farm Credit's collateral without paying the proceeds to Farm Credit. However, the evidence is disputed as to whether this injury was willful and malicious. With respect to the willfulness component, the evidence submitted by Debtor in opposition to Farm Credit's motion belies the contention that the Debtor intended to cause loss to Farm Credit or believed that loss was substantially certain to result from his actions. According to the Debtor, he believed that continued reinvestment of the sale proceeds was the way to make money and repay Farm Credit by the Notes' May 1, 2000 maturity date. His eventual default was the result of an overly ambitious desire to get rich quick, his youth, and his inexperience. Moreover, it should be noted that the Debtor did not divert the sale proceeds to his own use; rather, unknowing that such actions were prohibited by the Notes, he used the sale proceeds to purchase more cattle that continued to constitute Farm Credit's collateral. Under the Notes, "Collateral" includes "all additions, accessions, replacements, and substitutions of the Collateral and property of similar type now owned or hereafter acquired by the Borrower[]." Thus, rather than intending to harm Farm Credit, it is the Debtor's contention that his actions were designed to produce the proceeds from which he could repay Farm Credit. Accordingly, a genuine issue of fact exists as to whether the injury in question was willful.

The court reaches a similar conclusion as to the malicious component of § 523(a)(6), which, as previously noted, requires the injury to be without just cause or excuse, in conscious disregard of one's duties. The parties disagree as to whether Farm Credit was aware of the Debtor's type of operations. In his affidavit, Ronnie Sartain denies that the Debtor discussed a retained ownership operation, whereby he would be shipping the cattle out of state for resale. The Debtor, on the other

8

hand, although he admits that he never told specifically told anyone at Farm Credit that he was going to use sale proceeds to buy more cattle instead paying on the Notes, does state in his affidavit that he explained to Ronnie Sartain of Farm Credit his plans for a retained ownership operation, that Mr. Sartain advised that he would have to determine out-of-state lien rights, and then subsequently approved an additional loan for this venture. This testimony, along with the Debtor's other statements that he was unaware of the prohibition on sale of collateral in the Notes and that he was relying the Notes' maturity date, supports the Debtor's assertion that he did not knowingly disregard his contractual duties and therefore the injury to Farm Credit was not malicious, precluding summary judgment in Farm Credit's favor.

Farm Credit argues in its reply that notwithstanding Debtor's statements in opposition to its motion, summary judgment is still appropriate because it is undisputed that the Debtor violated the express terms of the Notes because he had no written authorization from Farm Credit to sell its collateral. Undeniably, the Debtor did breach his loan agreements with Farm Credit. However, mere breach of contract is insufficient to constitute a willful and malicious injury within the meaning of § 523(a)(6). *See Steier v. Best (In re Best)*, 109 Fed. Appx. 1, 6 (6th Cir. 2004) ("[W]e have held that a breach of contract cannot constitute the willful and malicious injury required to trigger § 523(a)(6)."); *Salem Bend Condominium Assoc. v. Bullock-Williams (In re Bullock-Williams)*, 220 B.R. 345, 347 (B.A.P. 6th Cir. 1998) (intent to cause harm encompasses more than just "knowing breach of contact"); 4 Collier on Bankruptcy ¶ 523.12[3] (15th ed. rev. 2008) ("Courts must be careful not to equate a breach of contact, which happens to be a security agreement, with conduct causing willful and malicious injury.").

Farm Credit also relies on several cases to support its assertion that conversion under facts similar to the present case is both willful and malicious. However, each cited case is either distinguishable, no longer good law after the Supreme Court's decision in *Kawaauhau v. Geiger,* or both. For example, in *United States v. Sandman (In re Sandman)*, 68 B.R. 784, 787 (Bankr. D. Mont. 1987), cited by Farm Credit, the court found a willful and malicious injury where the debtor failed to pay the proceeds from the sale of his crops to his secured creditor, using the money instead for operating expenses with the anticipation of repaying the creditor from next year's crop. In reaching this conclusion, the court held that § 523(a)(6) only requires an intentional act that leads to injury, the legal standard rejected in *Kawaauhau,* rather than an intentional injury. Similarly, the

9

Sixth Circuit's conclusion in *Vulcan Coals, Inc. v. Howard*, 946 F.2d 1226, (6th Cir. 1991), another case cited by Farm Credit, was based on the erroneous legal standard. *Id.* at 1228-29 ("[A] wrongful act done intentionally, which necessarily produces harm . . . may on constitute a willful and malicious injury."). The bankruptcy court's decision in *Farmers Bank v. McCloud (In re McCloud)*, 7 B.R. 819 (Bankr. M.D. Tenn. 1980), not only utilized the now-rejected standard, but also appears to have been rendered after a trial in which all factual issues were resolved, rather than on summary judgment.

Two cases cited by Farm Credit do rely on the current standard for nondischargeability under § 523(a)(6), but involved debtors that, without just cause or excuse, converted another's property for their own personal use. *See Nat'l City Bank of Mich. v. Marcotte (In re Marcotte)*, 288 B.R. 798, 801 (Bankr. C.D. Ill. 2002), and *Gibbs v. Nevels (In re Nevels)*, No. 06-3155, 2007 WL 2042449 (Bankr. E.D. Tenn. July 9, 2007). In *Marcotte*, the debtor, knowing that he was going to no longer farm, sold his last crop and liquidated his equipment, using the proceeds from both for his own personal purposes rather than paying the secured creditor. *In re Marcotte*, 288 B.R. at 801. In *Nevels*, the debtor used funds deposited by the plaintiffs in a trust account for the construction of a house by the debtor on purposes unrelated to the plaintiffs' construction. *In re Nevels*, 2007 WL 2042449, at *9. In both cases, the debtors knew that their use of the funds was wrongful and would injure the creditor, but offered no just cause or excuse for their actions. In the present case, however, the Debtor's subjective belief, according to his statements, was that his actions were permissible in that he had a line of credit for the purpose of buying and reselling cattle and that there was no prohibition on using sale proceeds to buy more cattle, as long as he had the money to pay off the Notes when they became due. Because these statements, if established at trial, would preclude a finding of nondischargeability, summary judgment is inappropriate. *Compare Cash Am. Fin. Servs., Inc. v. Fox (In re Fox)*, 370 B.R. 104, 119 (B.A.P. 6th Cir. 2007) (debtor's conversion of accounts to keep business afloat established negligence at most, rather than requisite intent to harm creditor); 4 Collier on Bankruptcy ¶ 523.12[3] ("Transfers in breach of a security agreement may give rise to nondischargeable liability when the debtor's conduct is knowing and certain to cause financial harm. Unless the creditor can prove not only that the debtor knew of the security interest, but also that the debtor knew that a transfer of the property was wrongful and certain to cause financial harm to the creditor, the debt should not be found dischargeable.").

10

Lastly, the court must address Farm Credit's contention that if it establishes a willful and malicious injury under § 523(a)(6), the Debtor's entire indebtedness to Farm Credit is nondischargeable. Farm Credit is mistaken in this regard.[4] As previously quoted, § 523(a)(6) excepts from discharge "any debt for willful and malicious injury . . . ." Thus, only to the extent that the debt arose from a willful and malicious injury is the debt nondischargeable. *See Fidelity Fin. Servs. v. Cox (In re Cox)*, 243 B.R. 713, 720 (Bankr. N.D. Ill. 2000) (amount nondischargeable in § 523(a)(6) action is fair market value of converted automobile, rather than loan balance). "Damages for conversion are generally limited to consequential damages, i.e., the value of the property at the time it was converted plus interest, that must be proved with reasonable certainty." *Lively v. Knight (In re Knight)*, No. 05-3154, 2007 WL1484494, * 4 (Bankr. E.D. Tenn. May 18, 2007) (citing *Caldwell v. Canada Track, Inc.*, No. W2003-264-COA-R3-CV, 2004 WL 1459418 (Tenn. App. June 28, 2004)). In this case, the judgment held by Farm Credit is for the balance owed by the Debtor under the Notes, plus costs and attorney fees. To the extent it is determined at trial that the Debtor willfully and maliciously converted Farm Credit's collateral, the amount nondischargeable will be the value of the collateral converted, with a maximum recovery of the entire indebtedness owed by the Debtor to Farm Credit.

IV.

In summary, the record before the court presents conflicting versions of material facts, thereby precluding summary judgment. The court will enter an order so holding.

# # #

---

[4]*Amertitrust Co. v. Rudicil*, No. 92-3003, 1992 WL 377093 (6th Cir. Dec. 18, 1992), the case cited by Farm Credit to support its proposition that the entire indebtedness is nondischargeable, is inapposite. Unlike the instant case, *Rudicil* involved an action for nondischargeability based on fraud under § 523(a)(2). The debtor therein argued that the amount nondischargeable was limited to the value of the collateral that the plaintiff had lost because of the debtor's fraud; the court disagreed, noting that entire sum loaned the debtor by the plaintiff had been obtained by fraud through the use of a forged signature. *Id*. at. *1.